**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>EDWARD KELLEY,<br><br>Defendant. | Criminal Action No. 22-408 (CKK) |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
(November 7, 2024)

The Government has charged Defendant Edward Kelley with multiple felony and misdemeanor offenses related to his alleged conduct during the riot at the United States Capitol on January 6, 2021. *See* Superseding Indictment, ECF No. 52. The operative indictment charges twelve counts:

(1)    Obstructing Officers During a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3);

(2)    Obstruction of an Official Proceeding and Aiding and Abetting the Same, in violation of 18 U.S.C. §§ 1512(c) and 2;

(3)    Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1);

(4)    Destruction of Government Property Causing Damage in an Amount Exceeding $1,000, in violation of 18 U.S.C. § 1361;

(5)    Destruction of Government Property Causing Damage in an Amount Less Than $1,000, in violation of 18 U.S.C. § 1361;

(6)    Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1);

(7)    Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2);

(8)    Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4);

(9)    Entering and Remaining in the Gallery of a House of Congress, in violation of 40 U.S.C. § 5104(e)(2)(B);

(10)    Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D);

(11)    Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F); and

(12)    Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

The Court held a two-day bench trial on these charges, beginning on October 28, 2024, and concluding the next day on October 29, 2024. *See* Bench Trial Tr. (Oct. 28, 2024) ("Oct. 28 Tr."); Bench Trial Tr. (Oct. 29, 2024) ("Oct. 29 Tr."). At trial, the Government introduced testimony from seven witnesses: (1) U.S. Capitol Police ("USCP") Captain Tia Summers; (2) U.S. Secret Service Inspector Lanelle Hawa; (3) USCP Officer Albert Chow; (4) USCP Officer Eugene Goodman; (5) Daniel Schwager, former General Counsel to the Secretary of the U.S. Senate; (6) Stephen McFall, a former Special Agent and Forensic Examiner for the Federal Bureau of Investigation ("FBI"); and (7) FBI Special Agent Jessi Mann. The Government also read into the record a stipulated list of undisputed facts on which both Kelley and the Government agree.[1] Oct. 28 Tr. at 88–95. The Court also admitted 102 exhibits into evidence in full and admitted one exhibit for demonstrative purposes only. *See* Gov't's Ex. List, ECF No. 81. Kelley exercised his constitutional right not to testify or present evidence in his defense. *See* Oct. 29 Tr. at 149–50.

After considering all the evidence, the Court finds the Defendant, Edward Kelley, **GUILTY** of **Counts One, Three, Four, Five, Six, Seven, Eight, Nine, Ten, Eleven,** and **Twelve** of the Superseding Indictment. The Court finds Kelley **NOT GUILTY** of **Count Two**, Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c) and 2. In reaching this verdict and the following findings of fact and conclusions of law, the Court has

---

[1] The parties previously provided the Court with a copy of these stipulations that was signed by Kelley, his counsel, and counsel for the Government. *See* Oct. 28 Tr. at 89; *see also* Minute Order (Oct. 18, 2024) (acknowledging receipt of signed copy).

considered the parties' arguments and stipulations, the witnesses' testimony, and the exhibits admitted into evidence at trial. After considering the demeanor of the Government's witnesses while testifying, the reasonableness of or unreasonableness of their testimony, the probability or improbability of their testimony, the consistency or inconsistency of their testimony with other evidence, and all reasonable inferences to be drawn therefrom, among all other matters bearing on the witnesses' credibility, the Court credits the testimony of each of these witnesses in full. Unless otherwise noted, the Court finds that the relevant testimony and other evidence in this case is undisputed and unrebutted.

## I. FINDINGS OF FACT

### A.  Security at the United States Capitol

The U.S. Capitol, which is located at First Street SE in Washington, D.C., is secured at all hours of the day by USCP officers. Oct. 28 Tr. at 90 (stipulation of the parties). Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP officers. *Id.* Only authorized individuals with appropriate identification are allowed inside the Capitol. *Id.* at 90–91.

No members of the public were authorized to be present at the Capitol Building on January 6, 2021. Oct. 28 Tr. at 71. Accordingly, no members of the public were authorized to enter the Senate Gallery that day. Oct. 28 Tr. at 52. On other days, when members of the public are authorized to be present at the Capitol Building, they must undergo security screening at the Capitol Visitor Center on the east side of the building before entering, including passing through a metal detector. Oct. 28 Tr. at 56–57, 105; *see also id.* at 90 (stipulation of the parties regarding location of the visitor center). Members of the public must also undergo a second security screening before entering the gallery of either the House of Representatives or the Senate. *See* Oct. 28 Tr. at 104–05.

3

On January 6, public access to the U.S. Capitol and its grounds was restricted in part because then-Vice President Mike Pence was scheduled to be present at a joint session of Congress to preside over the certification of the vote of the Electoral College.  Oct. 28 Tr. at 67–71.  USCP established these restrictions in consultation with the U.S. Secret Service.  *Id.* at 68–71.  The restriction on public entry into the Capitol and its grounds was prominently noted around the perimeter of the grounds, including by large signs reading "Area Closed," as well as interlocking bike racks and plastic fencing that formed a physical barrier around the grounds.  *Id.* at 39, 41, 45–46, 109, 111; Gov't's Exs. 403–04.

### B.      Preparations for the Certification of the Vote of the Electoral College

The certification proceeding at which Vice President Pence would be presiding on January 6 was required by the Constitution and by statute.  *See* U.S. Const. amend. XII; 18 U.S.C. §§ 15–18 (2021).  During the certification of the votes of the Electoral College, the Vice President and other officials would inspect "certificates of vote" from each state and the District of Columbia, each of which reflects the votes of electors for President and Vice President, to determine that the certificates are authentic and in proper form and to count the votes of the electors.  Oct. 28 Tr. at 221, 223.

In preparation for this proceeding, each state and the District of Columbia prepared certificates of vote documenting the votes of its electors.  *Id.* at 218–19.  By law, each state and the District of Columbia was required to create six original certificates and send one certificate to the President of the Senate—that is, the Vice President of the United States—two certificates to the Archivist of the United States, two certificates to the state or district's top election official, and one certificate to the chief judge of the United States District Court of the district in which the vote took place.  *Id.* at  216; 3 U.S.C. §§ 9, 11 (2021).  The Office of the Secretary of the Senate received the President of the Senate's set of certificates and stored them in a secure location until the joint

session of Congress began on January 6, 2021. *Id.* at 218–19. On January 6, the Office of the Secretary delivered the President of the Senate's set of certificates to the Senate Chamber. *Id.* at 220.

Vice President Pence arrived at the Capitol at approximately 12:30 p.m. on January 6. Oct. 28 Tr. at 76. At approximately 1:00 p.m., Vice President Pence went to the Senate Chamber and led members of the Senate across the Capitol Building to the House Chamber to begin the joint session of Congress to certify the votes of the Electoral College. *Id.* At that time, staff of the Secretary of the Senate carried the certificates of vote from the Senate Chamber to the House Chamber so that they could be considered in the joint session. *Id.* at 220.

About 15 minutes after the Senators arrived in the House Chamber, a member of the House of Representatives raised an objection to the certification of Arizona's electoral college votes. *Id.* at 76–77, 240–41. After Vice President Pence concluded that the objection was in proper form, the House and Senate recessed to their separate chambers to consider the objection. *Id.* at 240. When the House and Senate recessed to their separate chambers to debate the objection to the certification of Arizona's electoral votes, the Office of the Secretary carried the certificates back to the Senate Chamber for safekeeping. *Id.* at 242.

### C. The Riot and Attack on the Capitol

Soon after House and Senate recessed into their separate chambers to consider the objection, USCP and Secret Service officers became aware of a security breach outside the West Front of the Capitol Building near Peace Circle. *See* Oct. 28 Tr. at 77–78. This security breach eventually led the Secret Service to move Vice President Pence out of the Senate Chamber and into a more secure location within the Capitol. *Id.* at 78; Gov't's Exs. 2, 103. The Vice President remained in this secure location for approximately five hours. Oct. 28 Tr. at 83.

Soon after Vice President Pence was moved to a secure location, the Senate went into recess. *Id.* at 243–45. Staff of the Secretary of the Senate then secured the certificates of vote and eventually evacuated them from the Senate Chamber. *Id.* 246, 248–49. After staff evacuated the certificates from the Senate Chamber, the certificates remained secure; no rioters ever directly encountered them or had access to them. *Id.* at 249.

Because of the rioters' breach of the Capitol perimeter and eventual entry into the Capitol Building itself, Congress could not resume its joint session to certify the votes of the Electoral College for more than five hours. *Id.* at 252. Each rioter's presence inside the Capitol Building impeded the orderly conduct of government business and official functions, including the joint session of Congress taking place that day. *See id.* at 60. Because the presence of the rioters threatened the safety of Members of Congress and USCP officers, it was not possible for Congress to continue the proceeding until every unauthorized entrant had been cleared from the Capitol Building and the entire building had been physically searched for dangerous items that rioters may have left behind. *See id.* The proceeding could not have continued if even a single rioter remained in the building, and Congress did not resume its work until shortly before 8 p.m. *Id.* at 60, 84–85, 251–52.

The riot also adversely affected the conduct of interstate commerce by businesses located in the District of Columbia. For example, Safeway stores in the District closed early on January 6 because of a curfew enacted as a direct response to the riot at the Capitol. *See* Oct. 29 Tr. at 133–34; Gov't's Ex. 613A. Because of that early closure, the affected Safeway stores completed significantly fewer sales than expected on January 6 compared to the day before or the day after. *See* Oct. 29 Tr. at 134–35; Gov't's Ex. 613B.

### D.  Kelley's Participation in the Riot and Attack on the Capitol

1.    Kelley's Identity

The Government's evidence of Kelley's role in the events of January 6 consists primarily of videos and photographs that depict a masked individual, whom the Government alleges is Kelley, committing the violent and unlawful acts in the Capitol Building and its grounds for which Kelley is charged in this case.  *See, e.g.*, Gov't's Exs. 303, 307B, 104A, 309, 111A, 112.  The videos show this individual assaulting a USCP officer by helping two others tackle the officer to the ground, Gov't's Ex. 303 at 38:57–39:01; damaging an exterior window to the Senate Wing of the Capitol Building with a piece of wood and later entering the building through the frame of that broken window, Gov't's Ex. 307B at 1:56–2:01, 2:45–2:48; kicking an exterior door adjacent to the broken window open, allowing scores of other rioters to enter the building, Gov't's Ex. 104A at 1:28–1:33; walking near the front of a group of rioters, some of whom were demanding to know where Members of Congress were counting the votes of the Electoral College, as they marched through the Capitol, Gov't's Ex. 309 at 0:51–1:05; and later entering the Senate Gallery without submitting to security screening, Gov't's Ex. 112 at 1:19.  In these videos, the face of the individual whom the Government alleges is Kelley is mostly obscured, first by a large respirator and later by a red-white-and-blue patterned cloth face mask.  *See, e.g.*, Gov't's Ex. 303 at 39:00; Gov't's Ex. 104A at 1:33; Gov't's Ex. 309 at Gov't's Ex. 111A at 0:37; Gov't's Ex. 112 at 1:05; *see also* Oct. 29 Tr. at 142.

Kelley—through his attorney—admits that he was in Washington, D.C. on January 6, 2021, but he disputes that he is the person depicted in these videos.  Oct. 29 Tr. at 182–83.  However, the Government's evidence establishes beyond a reasonable doubt that this individual is Kelley.

Several distinctive articles of clothing distinguish the individual the Government alleges is Kelley from others in the crowd that was at the Capitol on January 6 and ultimately show that this

individual is the Defendant, Edward Kelley.  In each of the Government's relevant video exhibits, the individual in question can be seen wearing a green tactical helmet with a tan-colored mounting point in the forehead area; clear protective googles with black frames; a black hooded sweatshirt with distinctive lettering across the chest; green pants; a tan-colored backpack with tan straps; and a green pouch attached to the right side of the backpack.  *See, e.g.*, Gov't's Ex. 303 at 39:00–39:01; Gov't's Ex. 307B at 2:08–09, 2:47; Gov't's Ex. 104A at 0:05; 1:13, 1:33; Gov't's Ex. 309 at 1:05; Gov't's Ex. 111A at 0:37; Gov't's Ex. 112 at 1:05.  In some of the videos, white blocks bearing the letters "TCAPP" are visible across the chest of this individual's black hooded sweatshirt.  *See, e.g.*, Gov't's Ex. 303 at 39:00; Gov't's Ex. 309 at 1:05; Gov't's Ex. 111A at 0:37.  (Multiple photographs taken earlier in the day on January 6 depict Kelley wearing the same distinctive "TCAPP" sweatshirt at times when his face was fully visible.  *See*  Gov't's Ex. 502, 415–16. "TCAPP" is an acronym for "The Church at Planned Parenthood," which is an organization in Tennessee of which Kelley is a member. Oct. 29 Tr. at 147.)  One video shows that the individual in this attire is also wearing a magazine pouch on the left side of his body and appears to be wearing an inside-the-waistband holster for a handgun on the right side of his body.  *See* Gov't's Ex. 307B at 2:47; *see also* Gov't's Ex. 307C (still frame); Oct. 29 Tr. at 32–35 (identifying magazine pouch and holster in this video).  This video also shows what appear to be marks left behind by drops of liquid around the forehead area of the individual's helmet.  *See* Gov't's Ex. 307B at 2:10. Collectively, these characteristics allowed Agent Mann to distinguish the individual in question from other rioters and trace the individual's movements through the Capitol building on January 6, across multiple cameras and videos.  *See* Oct. 29 Tr. 57, 142.  Notably, the combination of the green helmet with a tan mounting point on the forehead, black sweatshirt, and tan backpack is distinctive:  None of the other rioters in the crowd at the Capitol on January 6 that are visible in

the Government's numerous video exhibits are wearing this same combination of clothing and accessories. *See, e.g.*, Gov't's Exs. 303, 307B, 309.

These features not only distinguish the individual in question from others in the crowd at the Capitol, but also support the conclusion that this individual is the defendant, Edward Kelley, for three reasons: they are consistent with the appearance of items seized from Kelley's possession pursuant to a search warrant, several of them appear in "selfie"-style photographs recovered in a search of Kelley's cell phone, and some of them are visible in photographs of Kelley taken earlier on January 6 in which his face is clearly visible because he was not wearing a mask.

*First,* these features are consistent with the appearance of items seized from Kelley's possession pursuant to a search warrant. On May 5, 2022, the Government executed warrants authorizing Kelley's arrest and searches of his vehicle and home. *See* Oct. 29 Tr. at 57–58. Agent Mann, who was present for Kelley's arrest and the search of his vehicle, identified him in court as the person whom the agents arrested and whose vehicle they searched. *Id.* at 58.

During the search of Kelley's vehicle, agents seized a tan backpack and a green pouch that were visually consistent with the backpack and pouch depicted in the Government's video exhibits from January 6. Oct. 29 Tr. at 117–19 (discussing Gov't's Exs. 902–03).

During Kelley's arrest, agents also seized a magazine pouch and inside-the-waistband holster from his person. Oct. 29 Tr. at 123–27 (discussing Gov't's Exs. 912–13); *see also* Gov't's Exs. 421A–B. Using these same items, Agent Mann performed an in-court demonstration showing how the pouch and holster are designed to be worn on the body. *See* Oct. 29 Tr. at 124–29. During this demonstration, Agent Mann attached these items to her waistband and belt, as they are designed to be used in practice. *See id.* She then showed the Court how the inside-the-waistband holster's clip is visible on the outside of the wearer's beltline. *Id.* at 127. She also showed the

Court how the holster causes visible "printing" through the outside of the wearer's pants leg and causes the beltline to protrude outward from the wearer's body, revealing the holster's presence. *See id.* at 127–29, 132. The Court finds that the appearance of the pouch and holster as demonstrated by Agent Mann, including the holster's clip visible on the outside of her beltline, the printing on the leg of her pants, and the outward protrusion of her beltline on the side of her body on which she was wearing the holster, are all visually consistent with the same features on the body of the individual captured on video whom the Government alleges is Kelley. *See* Gov't's Exs. 422; 307B at 2:47; *see also* Gov't's Ex. 307C (still frame). These facts support the conclusion that the person depicted in the Government's video exhibits was wearing an inside-the-waistband holster like the one the Government recovered from Kelley's person during his arrest.

Later, agents seized other articles from Kelley's residence that were consistent with those depicted in the Government's video exhibits, including a black hooded sweatshirt bearing the letters "TCAPP" in white blocks across the chest and a helmet with a prominent mount point in the forehead area. Oct. 29 Tr. at 120–123 (discussing Gov't's Exs. 906–07); *see also* Gov't's Exs. 420B–D. Although the helmet had been painted a different color by the time the agents seized it, the original color was visible through the new coat of paint, and the mounting hardware in the forehead area was unchanged. *See* Oct. 29 Tr. at 121; Gov't's Exs. 907, 420C–D. The Government also seized receipts for purchase of several other distinctive items consistent with the appearance of the individual it alleges is Kelley, including a "gas mask" and a pair of anti-fog goggles. *See* Oct. 29 Tr. at 108–10; Gov't's Ex. 420G–H.

The fact that Kelley had each of these distinctive items on his person, in his vehicle, or in his residence at the time of his arrest strongly supports the conclusion that he is the person depicted wearing these items in the Government's video exhibits from January 6.

*Second*, many of the distinctive features visible in the Government's video exhibits are also visible in two "selfie"-style photographs recovered from Kelley's cell phone that appear to have been taken in the Senate Gallery during the riot on January 6. *See* Gov't's Exs. 505–06. The Government retrieved these photographs through forensic examination of Kelley's cell phone, which agents seized during his arrest, *see* Oct. 29 Tr. at 8–9, 17, and Kelley stipulated that these photographs are accurate and authentic copies of digital content extracted from his phone, Oct. 28 Tr. at 94–95. In these apparent self-portraits, the subject is wearing a green tactical helmet with a tan mounting point in the forehead area, a red-white-and-blue-patterned cloth face mask, clear protective goggles with black frames, and a black hooded sweatshirt. *See* Gov't's Exs. 505–06. In one of the photographs, the tan straps of what appears to be a backpack are also visible. *See* Gov't's Ex. 505. An expert in forensic extractions and file systems analysis testified based on an analysis of the file system of Kelley's cell phone that it was "highly likely" that someone had attempted to delete these photographs from the device, but that other photographs in the device's camera roll that appeared to have been taken outdoors on January 6 had not been deleted. *See* Oct. 29 Tr. at 8, 20–23; *see also* Gov't's Ex. 501A (demonstrative). The fact that the apparent self-portraits from the Senate Gallery were recovered from Kelley's cell phone supports an inference that Kelley is the person depicted wearing the distinctive clothing visible in those photographs. And the fact that someone attempted to delete these photographs further supports that inference because it suggests that Kelley—the owner of the phone—may have regarded the photographs as incriminating.

*Third*, some of the same distinctive articles of clothing and accessories seen in the Government's video exhibits from inside and around the Capitol Building are also visible in photographs of Kelley taken near in time to the riot on January 6 in which he is not wearing a mask

and his face is visible. *See, e.g.*, Gov't Ex. 502, 415–16. For example, a "selfie"-style photograph recovered from Kelley's cell phone shows him standing outside while wearing a black sweatshirt and backpack with tan straps consistent with those seen in the Government's video exhibits, along with a red "Make America Great Again" hat. *See* Gov't Ex. 502; Oct. 29 Tr. at 17. Another photograph taken near the Peace Monument at Peace Circle shows Kelley wearing similar apparel and shows the straps of his backpack and the white blocks across the chest of his black hooded sweatshirt. *See* Gov't Ex. 415; Oct. 29 Tr. at 65–66. Yet another photograph shows Kelley walking up the Pennsylvania Avenue walkway toward the Capitol, wearing what appear to be the same black hooded sweatshirt, backpack, and red hat. *See* Gov't Ex. 416; Oct. 28 Tr. at 120–21; Oct. 29 Tr. at 67–68. These photographs show that on January 6, Kelley was wearing some of the same clothes and accessories depicted in the Government's video exhibits from inside and around the Capitol Building, further supporting an inference that he is the individual depicted in those videos.

Finally, two pieces of circumstantial evidence support the conclusion that Kelley is the individual depicted in the Government's video exhibits from inside and around the Capitol Building. First, the Government's video evidence shows that an individual wearing the distinctive helmet, backpack, and other apparel that it attributes to Kelley entered the Senate Gallery and remained there for approximately three minutes, which is consistent with Kelley having taken the "selfie"-style photographs in the Senate Gallery that were recovered from his cell phone. *See* Gov't Exs. 505–06 (photographs recovered from Kelley's phone); Gov't Ex. 112 at 1:19 (showing entry into Senate Gallery at approximately 2:42 p.m.); *id.* at 4:42 (showing exit at approximately 2:45 p.m.); *see also* Gov't Ex. 417 (showing this individual in the Senate Gallery). Second, the Government introduced photographs showing Kelley on January 6 facing the Capitol

12

from Peace Circle and later approaching the Capitol from the direction of Peace Circle via the Pennsylvania Avenue walkway, which leads to the location on the West Plaza where the individual depicted in the Government's video exhibits first appears wearing a helmet and respirator.  *See* Gov't's Exs. 415–16 (photographs), 206A (video from West Plaza showing helmet and respirator), 408 (illustrating Peace Circle, Pennsylvania Avenue walkway, and West Plaza); Oct. 28 Tr. at 112–13, 120–21; Oct. 29 Tr. at 65–72.  This circumstantial evidence is consistent with the Government's narrative of Kelley's whereabouts on January 6 and corroborates its allegation that he is the individual depicted in its video exhibits recorded from inside and around the Capitol Building.

As the Government acknowledges, it has not introduced direct evidence showing that Kelley changed his appearance by donning a respirator, mask, helmet, or set of goggles on January 6, and there are brief gaps in its "trace" of his movements on that day.  *See* Tr. at 144, 184. Nor has the Government introduced evidence that anyone could see Kelley's face or recognize the sound of his voice while he was in the Capitol.  *See* Tr. 142–42.

However, the Government's other evidence that Kelley is the individual depicted in its video exhibits recorded from inside and around the Capitol Building is strong and unrebutted. Accordingly, for all the foregoing reasons, and after considering all the testimony and exhibits introduced at trial, the Court concludes beyond a reasonable doubt that Kelley is, as the Government alleges, the person depicted in the Government's video exhibits committing the acts in and around the U.S. Capitol Building for which he is charged in this case.

2.    Kelley's Actions

Having found that Kelley is the masked individual depicted in the Government's video exhibits, the Court finds that Kelley engaged in the following conduct on January 6, 2021.

13

After traveling to Washington, D.C. from Maryville, Tennessee the day before, Kelley attended the "Stop the Steal" rally that then-President Donald J. Trump hosted near the White House on January 6, 2021. Using his cell phone, Kelley took a picture at the rally of a large video screen showing President Trump speaking to the crowd. *See* Gov't Ex. 508. At this rally, President Trump described Vice President Pence's role in the certification proceeding that would be taking place at the U.S. Capitol later that day. Gov't Ex. 615 at 6, 10, 20, 25. President Trump also stated, "We have come to demand that Congress do the right thing and only count the electors who have been lawfully slated." *Id.* at 10. President Trump did not directly mention the certificates of vote or any other documents to be used in the certification proceeding. *See id.*

After the rally, Kelley walked toward the U.S. Capitol Building, eventually pausing with other demonstrators at the Peace Monument at Peace Circle. *See* Gov't Exs. 502, 415. At Peace Circle, Kelley's face was visible, and he was wearing a red "Make America Great Again" hat, a black sweatshirt with white lettering blocks across the chest, and a tan backpack; he was not wearing gloves or a mask. *See* Gov't Ex. 415.

Kelley later advanced with the crowd from Peace Circle toward the West Front of the Capitol Building via the Pennsylvania Avenue walkway. *See* Gov't's Exs. 416; *see also* Gov't's Ex. 310 at 4:30–5:03. At the time, the West Front was covered with scaffolding for a stage being installed for the upcoming presidential inauguration. Oct. 28 Tr. at 91. As they approached, Kelley and other members of the crowd encountered multiple barriers defended by USCP officers, including interlocking bike racks and green plastic fencing, indicating the secure perimeter around the U.S. Capitol grounds that members of the public were not authorized to cross. *See* Oct. 28 Tr. at 39, 113–15; Gov't Ex. 409; *see also* Gov't Ex. 310 at 4:46–5:03. Kelley and other members of the crowd also encountered prominent signs indicating that the area was closed and that

14

unauthorized entry into the grounds was prohibited. *See* Gov't's Ex. 403–04; Oct. 28 Tr. at 39–42; *see also* Gov't Ex. 402 (illustrating perimeter). The Court finds that Kelley knew from the presence of these barriers and signs that he did not have lawful authority to enter any part of the U.S. Capitol or its grounds on January 6.

Soon after members of the crowd reached the first set of barriers between Peace Circle and the West front of the Capitol, some members of the crowd began to riot. *See* Gov't's Ex. 310 at 5:06–5:20. The rioters began a physical confrontation with USCP officers in which they forced their way through the barrier, eventually knocking at least one of the officers to the ground and forcing the officers to retreat. *Id.* at 5:15–6:01. After the officers had retreated, Kelley advanced across the restricted perimeter and walked toward the Capitol via the Pennsylvania Avenue walkway. *See* Gov't's Ex. 416; Oct. 29 Tr. at 68–69. His face was fully visible at this time, and he was still wearing the red "Make America Great Again" hat. *See* Gov't's Ex. 416.

Soon afterward, by approximately 1:45 p.m., Kelley joined a crowd that was chanting and facing USCP officers at another line of interlocking bike racks closer to the West Front of the Capitol Building. *See* Gov't's Exs. 206A–B; Oct. 29 Tr. at 69–72. Kelley stood near the front of the crowd, directly in front of the USCP line. Gov't's Ex. 206A at 0:01. By this time, Kelley had donned the helmet and goggles that were later recovered from his residence, along with a pair of black gloves and a large respirator, and he was also wearing the same black sweatshirt with block lettering and tan backpack that he had been wearing earlier. *See* Gov't's Ex. 206A at 0:01; Oct. 29 Tr. at 70.

From there, Kelley joined other rioters, advanced through a nearby opening in the police lines, and proceeded under the scaffolding around the West Front of the Capitol Building. *See generally* Gov't's Ex. 303 at 35:36–38:30 (showing the crowd's advance into and under the

scaffolding); *see also id.* at 39:00 (showing Kelley's presence under the scaffolding). Once under the scaffolding, Kelley encountered USCP Officer Albert Chow, who was defending an entrance to the area and had become isolated from other officers and outflanked by rioters after other USCP officers retreated to another position. Gov't's Ex. 303 at 38:56; Oct. 28 Tr. at 136. At the time, Officer Chow was actively working to repel rioters from unlawfully entering the Capitol Building. *See* Gov't's Ex. 303 at 38:56; Oct. 28 Tr. at 135–39. He was also wearing a black jacket that read "U.S. Capitol Police" in clear, block letters across the back. Gov't's Ex. 303 at 38:56 While Officer Chow was attempting to perform these duties in the face of an overwhelming number of rioters, Kelley approached Officer Chow from behind and, with the help of two other rioters, tackled the officer to the ground. *Id.* at 38:57–39:01. Officer Chow struck his head on the steps of the Capitol as he fell. *See id.*; Oct. 28 Tr. at 136–37. Based on Officer Chow's actions and visible apparel at the moment that Kelley helped tackle him, the Court finds that Kelley knew that Officer Chow was a federal law enforcement officer engaged in the performance of his official duties in response to the riot at the Capitol and that Kelley tackled the officer with the purpose of obstructing him in the performance of those duties.

After assaulting Officer Chow, Kelley again made his way to the front of the crowd and stood face-to-face with USCP officers who were defending the Capitol Building. Gov't's Ex. 302A at 2:12–2:47. Once there, he joined other rioters in pushing a bike rack in the direction of the officers, apparently attempting to push them back and allow the crowd to advance through the position to which the officers had fallen back at the top of the stairs. *Id.*; *see also id.* at 3:52–4:20; Oct. 28 Tr. at 138–39.

With Kelley's help, rioters eventually pushed through the police line at the top of the stairs and made their way to a set of stairs leading to the Senate Wing Door to the Capitol Building. *See*

Gov't's Ex. 307B at 0:00–0:34; Oct. 29 Tr. at 75–78.  At the top of those stairs, the rioters forced their way through a final police line.  *See* Gov't's Ex. 307B at 0:34–1:17.

As USCP officers fell back from the line, Kelley was among the first rioters to run forward toward the Senate Wing Door of the Capitol Building.  *See id.* at 1:35–1:50.  Like other doors on the West Front of the Capitol Building, this door is not a public entrance to the Capitol Building; instead, it serves primarily as an emergency exit point.  Oct. 28 Tr. at 58.  Once Kelley arrived at the Senate Wing Door, he picked up a long plank of wood that another rioter had thrown partway through a window adjacent to the door, partly shattering the window.  Gov't's Ex. 307B  at 1:56–1:58.  Using that piece of wood, he forcibly shattered another part of the window, widening the opening into the Capitol Building.  *Id.* at 1:56–2:01.  He then kicked the Senate Wing Door twice from the outside, attempting to force it open.  *Id.* at 2:05–2:08.  Moments later, two other rioters used a shield stolen from police officers and the piece of wood to shatter what remained of the adjacent window that Kelley had damaged.  *Id.* at 2:14–2:27.  Kelley then climbed through the broken window into the Capitol Building at approximately 2:13 p.m.  *Id.* at 2:37–2:48; Gov't's Ex. 104A at 1:10–1:13.  Kelley was the fourth rioter, out of hundreds, who entered the Capitol on January 6.  Gov't's Ex. 307B; *see also* Gov't's Ex. 104A at 1:10–1:13.

Once inside, Kelley immediately began working to help other rioters enter the Capitol Building.  *See* Gov't's Ex. 104 at 1:13–1:30.  He pushed hard on the Senate Wing Door, attempting to force it open from the inside despite the fact that it was locked.  *See id.* at 1:13–1:23.  Then, after watching another rioter try and fail to kick the door open, Kelley returned and kicked the locked door open with great force, seriously damaging the door in the process.  *See id.* at 1:23–1:30.  After Kelley succeeded in kicking the door open, rioters immediately began streaming through the doorway into the Capitol Building.  *Id.* at 1:30–1:39; *see also* Gov't's Ex. 309 at 0:00–

0:16. The high-pitched sound of an alarm from the broken door was audible over the noise of the crowd as rioters entered. *See* Gov't's Ex. 309 at 0:11–0:13; *see also* Oct. 28 Tr. at 58–59, 184.

After breaking open the Senate Wing Door, Kelley advanced with a crowd of rioters through the halls of the Capitol Building. *See* Gov't's Ex. 309 at 0:13–0:53. As they walked, many of the rioters were chanting and pumping their fists. *Id.* At least one carried an American flag bearing the name of President Trump. *Id.* at 0:39. Another shouted, "Where are they meeting at?" *Id.* at 0:47–0:49. Still another shouted, "Where are they counting?" *Id.* at 0:51–0:53. Kelley was within earshot of these demands, which echoed off the walls Capitol Building hallway through which the rioters were advancing. *See id.* at 0:47–0:53, 1:04. No member of the crowd audibly mentioned ballots, certificates of vote, or any other documents to be used in the certification proceeding. *See id.* at 0:13–1:10.

Moments later, USCP Officer Eugene Goodman confronted the crowd and commanded them repeatedly to step back and leave the Capitol Building, pointing in the direction of the exit. Oct. 28 Tr. at 185–87; *see* Gov't's Ex. 309 at 0:50–1:10. Kelley stood at the very front of the crowd as Officer Goodman gave this command and pointed back in his direction, in support of the crowd's demand for information about where Members of Congress were meeting to certify the votes of the Electoral College. *See* Gov't's Ex. 309 at 1:04. Officer Goodman understood this gesture as a threat and an expression of the rioters' intention to advance past his position. Oct. 28 Tr. at 188–89. The Court infers from Kelley's gesture toward Officer Goodman that Kelley intended to find the location where Congress was counting the votes of the Electoral College and go to that location to disrupt the proceeding.

Officer Goodman, alone and vastly outnumbered by the rioters, had by that time exhausted his supply of pepper spray while defending other areas of the Capitol Building. Oct. 28 Tr. at 186.

He eventually retreated up the stairs to the second floor, pursued by Kelley and a crowd of other rioters. *Id.* at 189–90; Gov't's Ex. 309 at 1:11–1:47.

Once Kelley and the other rioters were on the second floor, Kelley continued to search for a way into the chambers where Members of Congress were meeting. He walked through multiple hallways, the Ohio Clock Corridor, and the Crypt, all of which were closed to members of the public at the time. *See* Gov't's Exs. 121A, 108A, 104B, 115; Oct. 29 Tr. at 81–89. Sometime after passing through the Crypt, Kelley removed his respirator and donned a red-white-and-blue-patterned cloth face mask. Oct. 29 Tr. at 89. After changing into this mask, Kelley walked through the Rotunda and a lobby outside the Rotunda. *See* Gov't's Exs. 118A, 119A; Oct. 29 Tr. at 89–92. He then proceeded past an open door leading outside to the East Front of the Capitol Building and looked out, but he did not exit the Capitol. Gov't's Ex. 116A; Oct. 29 Tr. at 93–94. Instead, he walked up a set of stairs, continuing to the third level of the Capitol Building. Gov't's Exs. 116A, 110; Oct. 29 Tr. at 93–95.

Once on the third floor of the Capitol Building, Kelley walked at the front of a group of rioters down a hallway, then entered another hallway immediately outside the Senate Gallery. *See* Gov't's Exs. 110, 111A; Oct. 29 Tr. at 95–97. Once he reached the hallway outside the Senate Gallery, Kelley began attempting to open the doors that lead into the gallery. *See* Gov't's Ex. 111A, 112; Oct. 29 Tr. at 97–99. After trying multiple locked doors, Kelley succeeded in entering the Gallery at approximately 2:42 p.m. Gov't's Exs. 111A at 1:19, 112 at 1:19; Oct. 28 Tr. at 53–54. Neither Kelley nor any other member of the public was authorized to enter the Senate Gallery on January 6, 2021. Oct. 28 Tr. at 52.

Once Kelley was inside the Senate Gallery, it was evident to him that Members of Congress had recessed from the Senate Chamber and were no longer meeting there in connection with the

proceeding to certify the votes of the Electoral College.  *See* Gov't's Ex. 505.  While inside the

gallery, Kelley used his cell phone to take two "selfie"-style photographs of himself, both of which

depict his distinctive helmet, goggles, and red-white-and-blue-patterned cloth face mask and show

the Senate Floor in the background.  *See* Gov't's Exs. 505–06.  About three minutes later, at

approximately 2:45 p.m., Kelley exited the Senate Gallery via the same hallway through which he

had entered.  *See* Gov't's Ex. 112 at 4:42; Oct. 29 Tr. at 103.

After exiting the Senate Gallery, Kelley walked through the Rotunda, where he used his

cell phone to take a photograph of the interior of the Capitol Building.  *See* Gov't's Exs. 124A,

504; Oct. 29 Tr. at 103–04.  He then exited the Capitol Building through a door near the Rotunda

at approximately 2:55 p.m., having been inside the building for about 42 minutes.  Gov't's Ex.

124B at 0:53–58; *see* Gov't's Ex. 104A at 1:10–1:13 (showing entry at approximately 2:13 p.m.).

## II. CONCLUSIONS OF LAW

Based on the foregoing findings of fact, the Court finds the Defendant, Edward Kelley,

**GUILTY** of **Counts One, Three, Four, Five, Six, Seven, Eight, Nine, Ten, Eleven,** and **Twelve**

of the Superseding Indictment.  The Court finds Kelley **NOT GUILTY** of **Count Two**,

Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C.

§§ 1512(c) and 2.  The following conclusions of law are based on the record in this case and may

not be applicable to other cases arising from the same events.

### A.  Count One: Obstructing Officers During a Civil Disorder

To find Kelley guilty of Count One, Obstructing Officers During a Civil Disorder, in

violation of 18 U.S.C. § 231(a)(3), the Court must find beyond a reasonable doubt that: (1) Kelley

committed or attempted to commit an act with the intended purpose of obstructing, impeding, or

interfering with one or more law enforcement officers; (2) Kelley did so knowingly; (3) that, at the

time of the actual or attempted act, the law enforcement officer or officers were engaged in the

lawful performance of their official duties incident to and during a civil disorder; and (4) that the civil disorder in any way obstructed, delayed, or adversely affected commerce or the movement of any article or commodity in commerce, or the conduct or performance of any federally protected function.  In this context, "commerce" means commerce or travel between one state (or the District of Columbia) and any other state (or the District of Columbia), or commerce wholly within the District of Columbia.  *See* 18 U.S.C. § 232(2).

The riot at the Capitol on January 6 was a "civil disorder" within the meaning of Count One.  A civil disorder is any public disturbance involving acts of violence by a group of three or more people that "causes an immediate danger of or results in damage or injury to the property or person of any other individual."  18 U.S.C. § 232(1).  The riot on January 6 involved hundreds of people.  *See generally, e.g.*, Gov't's Ex. 303.  As the parties in this case have stipulated and as the Government's evidence shows, the riot resulted in significant damage to the U.S. Capitol Building. Oct. 28 Tr. at 91–92; Gov't's Ex. 307B at 1:56–2:01, 2:05–2:08; Gov't's Ex. 104 at 1:23–1:30. Rioters also caused serious injuries to USCP officers.  *See, e.g.*, Oct. 18 at 149–50.

This civil disorder adversely affected both federally protected functions and interstate commerce.  The riot delayed Congress's certification of the votes of the Electoral College, among other official federal functions.  *See* Oct. 28 Tr. at 83–85.  It also adversely affected interstate commerce conducted by businesses located in the District of Columbia.  *See* Oct. 29 Tr. at 133–35; Gov't's Ex. 613A–B (showing adverse effect on sales at Safeway stores in Washington, D.C.).

Kelley's assault on USCP Officer Albert Chow, which was captured in a video that the Court admitted into evidence and the Government played in open court during trial, satisfies the other elements of this offense beyond a reasonable doubt.  *See* Gov't's Ex. 303 at 38:57–39:01; Oct. 28 Tr. at 135–36.  As Officer Chow was performing his duties "incident to and during a civil

disorder" by attempting to prevent rioters from entering the Capitol Building, Kelley approached him from behind and, with the help of two other rioters, tackled him to the ground. Gov't Ex. 303 at 38:57–39:01. Kelley did so knowingly, as demonstrated by the deliberate way he approached Officer Chow from behind and placed both hands on him to force him to the ground. *Id.* At the time of this assault, Officer Chow was wearing a jacket bearing the words "U.S. Capitol Police" in clear, block letters across the back. *Id.* These words were clearly visible to Kelley as he approached. *See id.* Because Officer Chow's actions and apparel made it obvious that he was a law enforcement officer engaged in the performance of his official duties, the only reasonable inference from Kelley's conduct in tackling Officer Chow to the ground is that Kelley intended to obstruct, impede, or interfere with the officer's performance of those duties. *See id.*

The Court finds beyond a reasonable doubt that each element of the offense charged in Count One is satisfied, and it therefore finds Kelley **GUILTY** of **Count One**, **Obstructing Officers During a Civil Disorder**, in violation of 18 U.S.C. § 231(a)(3).

### B. Count Two: Obstruction of an Official Proceeding

The parties agree that to find Kelley guilty of Count Two, Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c), as a principal offender, the Court must find beyond a reasonable doubt that: (1) Kelley committed or attempted to commit an act that altered, destroyed, mutilated, or concealed a record, document, object, or other thing used or to be used in an official proceeding, or otherwise impaired the integrity of or rendered unavailable a record, document, object, or other thing used or to be used in an official proceeding; (2) Kelley intended to alter, destroy, mutilate, or conceal a record, document, object, or other thing used or to be used in an official proceeding, or otherwise impair the integrity of or render unavailable such a record, document, object, or other thing used or to be used in an official proceeding; and (3) Kelley acted corruptly. *See* Joint Proposed Jury Instructions, ECF No. 56 at 6. To find Kelley guilty of an

attempt, the Court must find that Kelley took a substantial step toward committing the completed offense that strongly corroborates or confirms his intent to commit the offense.  *See id.* at 4, 9; *United States v. Hite*, 769 F.3d 1154, 1164 n.5 (D.C. Cir. 2014).

The parties also agree that to find Kelley guilty of Count Two under an aiding-and-abetting theory, the Court must find beyond a reasonable doubt that: (1) others committed obstruction of an official proceeding by committing each of the elements of the offense charged, as explained above; (2) Kelley knew that obstruction of an official proceeding was going to be committed or was being committed by others; (3) Kelley performed an act or acts in furtherance of the offense; (4) Kelley knowingly performed that act or acts for the purpose of aiding, assisting, soliciting, facilitating, or encouraging others in committing the offense of obstruction of an official proceeding; and (5) Kelley did that act or those acts with the intent that others commit the offense of obstruction of an official proceeding.  *See* Joint Proposed Jury Instructions at 10.

The Government advances three primary theories of Kelley's guilt for the offense charged in Count Two as a principal offender, but none succeeds on this record.  First, the Government argues that Kelley attempted to destroy the certificates of vote.  Oct. 29 Tr. at 158–61.  Second, the Government argues that Kelley attempted to render the certificates of vote unavailable for use in the certification proceeding.  Oct. 29 Tr. at 161.  Third, the Government argues that Kelley completed the charged offense by rendering the certificates of vote unavailable for use in the proceeding when he and other rioters breached the Capitol Building, causing Senate staff to evacuate the certificates of vote from the Senate Chamber.  Oct. 29 Tr. at 161–63.

Each of these arguments fails because the Government has not proven beyond a reasonable doubt that Kelley acted with the specific intent to impair the integrity or availability of the certificates of vote for use in the proceeding, which the parties agree is an element of the offense.

*See* Joint Proposed Jury Instructions at 6.  Furthermore, the Government's argument that Kelley completed the offense by impairing the certificates' availability for use in the certification proceeding fails because that argument relies on an overly broad reading of the obstruction statute.

The Government candidly acknowledges that there is no direct evidence of Kelley's intent to impair the integrity or availability of the certificates of vote or any other document for use in the certification proceeding.  *See* Oct. 29 Tr. at 149.  It also acknowledges that if the Court cannot infer this intent "based on the totality of the evidence," it must acquit Kelley of the charge of obstructing an official proceeding as a principal offender.  *See id.*

The Government argues that the Court can infer the requisite intent from the fact that Kelley marched with other rioters who were shouting, "Where are they meeting at?" and "Where are they counting the votes?"  *See id.*; Gov't's Ex. 309.  However, Kelley's awareness of these comments does not establish beyond a reasonable doubt that Kelley was aware that the things being counted were documents or other physical things rather than voice votes, let alone that Kelley was acting with the intent to impair the integrity or availability of those things.  Even assuming, without deciding, that Kelley did know that Congress was evaluating and counting certificates of vote on January 6, the Government's evidence would support an inference that he intended only to influence how Members of Congress evaluated and counted those certificates, rather than to alter or destroy the certificates or impair their availability for use in the proceeding.

The Court has also considered whether it can infer the requisite intent from Kelley's decision to go to the Capitol after hearing President Trump's speech at his "Stop the Steal" rally near the White House.  On the record in this case, the Court concludes that it cannot do so.  Although the record supports an inference that Kelley heard President Trump describe some aspects of the certification process during this rally, including Vice President Pence's role in the

proceeding, President Trump never mentioned the certificates of vote or any other documents to be used in the certification proceeding. *See* Gov't's Ex. 615. Accordingly, on this record the Court cannot conclude beyond a reasonable doubt from Kelley's attendance at the rally, without more, that he specifically intended to impair the integrity or availability of the certificates of vote for use in the certification proceeding.

Because the Government's evidence in this case does not show beyond a reasonable doubt that Kelley specifically intended to impair the integrity or availability for use in an official proceeding of the certificates of vote or any other "record, document, or other object," *see* 18 U.S.C. § 1512(c)(1), the Government has not proven that Kelley is guilty of the offense charged in Count Two as a principal offender.

Even aside from the issue of Kelley's specific intent, accepting the Government's argument that Kelley impaired the availability of the certificates of vote for use in the official proceeding by causing them to be evacuated from the Senate Chamber would be inconsistent with the Supreme Court's direction that 18 U.S.C. § 1512(c) should not be interpreted as "a one-size-fits-all solution to obstruction of justice," but rather as an "evidence-focused statute." *Fischer v. United States*, 603 U.S. 480, 497 (2024). Instead, the better reading of § 1512(c) is that it prohibits conduct that "otherwise" impairs a document or other thing's "availability for use in an official proceeding" only if that impairment is like the impairment caused when someone "alters, destroys, mutilates, or conceals" a document or other thing. *See Fischer*, 603 U.S. at 487 (determining "the reach of [§ 1512(c)(2)'s] 'otherwise' clause" by "look[ing] for guidance from [the] examples [that] come before it"). For two reasons, the Government's evidence does not show that Kelley's presence or conduct impaired the availability of the certificates of vote for use in the certification proceeding in that sense.

*First*, the record shows that the certificates remained secure in the custody of the Secretary of the Senate throughout the riot. *See* Oct. 28 Tr. at 248–49. The certificates were never left behind in a location that Members of Congress could not access, and the rioters never had access to them. *See id.* The record in this case supports an inference that even while the riot was ongoing, the certificates could have been retrieved for use in the certification proceeding if Congress had reconvened in a different location. *See id.* Therefore, although Kelley's presence and conduct in the Capitol Building—including his eventual entry into the Senate Gallery—may have "impair[ed] the availability" of the *Senate Chamber* for use in the proceeding, it did not impair the availability of the *certificates* in the relevant sense.

*Second*, the relevant "official proceeding" was already in recess at the time that the certificates of vote were removed from the chamber. *See* Oct. 28 Tr. at 247–48. And the record does not show that there was any delay in resuming the proceeding that was attributable to the need to retrieve the certificates from a secure location. *See id.* at 251–53. Therefore, the relevant proceeding "was not in progress" and the "temporary removal of the [certificates] . . . did not immediately impact their availability to be used" in that proceeding. *United States v. DeCarlo*, No. 21-cr-073, 2024 WL 4650993, at *12 (D.D.C. Nov. 1, 2024) (BAH).

In sum, while the Government's evidence shows that Kelley and other rioters "certainly prevented the immediate ability of Congress to use the ballots in the official proceeding as intended, they did so by stopping the official proceeding itself" and forcing the evacuation of the Senate Chamber, "not by 'impair[ing]' the [certificates'] 'integrity or availability for use in an official proceeding.'" *DeCarlo*, 2024 WL 4650993, at *13 (alteration in original) (quoting 18 U.S.C. § 1512(c)(1)); *see, e.g.*, Oct. 28 Tr. at 246, 248–49. The Government therefore has not

proven that Kelley completed the offense charged in Count Two as a principal offender by impairing the availability of the certificates of vote.

The Government argues in the alternative that if Kelley did not commit Count Two as a principal offender, he aided and abetted others who did so. However, on the record in this case, this argument also fails. The Government did not introduce any evidence that any rioter other than Kelley came closer to completing the charged obstruction offense than Kelley did. And as one of the Government's witnesses testified, none of the rioters ever directly encountered or had access to the certificates of vote. Oct. 28 Tr. at 249. The record in this case also does not show beyond a reasonable doubt that any other rioter acted with the specific intent to impair the integrity or availability of the certificates of vote (or any other document or other physical thing) for use in the certification proceeding. Although the record makes clear that many of the rioters entered the Capitol with the intent to impede the certification proceeding itself, *see, e.g.*, Gov't's Exc. 309 at 0:47–0:53, the Government's evidence does not show beyond a reasonable doubt that those rioters intended to do so by impairing the integrity or availability of documents or other things for use in that proceeding. Therefore, the Government has not proven than anyone other than Kelley completed the offense charged in Count Two, and it follows that the Government has not proven that Kelley is guilty of aiding and abetting that offense.

Because the Court finds, on the record in this case, that the Government has not proven beyond a reasonable doubt that Kelley or any person he may have aided or abetted committed each of the elements of the offense defined in 18 U.S.C. § 1512(c) with the requisite mental state, the Court finds Kelley **NOT GUILTY** of **Count Two**, **Obstruction of an Official Proceeding and Aiding and Abetting the Same**, in violation of 18 U.S.C. §§ 1512(c) and 2.

### C.  Count Three: Assaulting, Resisting, or Impeding Officer Albert Chow

To find Kelley guilty of Count Three, Assaulting, Resisting, or Impeding USCP Officer Albert Chow, in violation of 18 U.S.C. § 111(a)(1), the Court must find beyond a reasonable doubt that: (1) Kelley assaulted, resisted, opposed, impeded, intimidated, or interfered with Officer Chow; (2) Kelley did so forcibly; (3) Kelley committed the relevant acts voluntarily and intentionally; (4) Officer Chow was an officer or an employee of the United States who was then engaged in the performance of his official duties; and (5) Kelley made physical contact with Officer Chow or acted with the intent to commit the felony charged in Count One.

Kelley's assault on Officer Chow satisfies each of these elements beyond a reasonable doubt. *See* Gov't Ex. 303 at 38:57–39:01; Oct. 28 Tr. at 135–36.  Kelley assaulted Officer Chow from behind by helping two other rioters tackle him, making physical contact with him in the process.  Gov't Ex. 303 at 38:57–39:01  Kelley's conduct was forcible, voluntary, and intentional, as demonstrated by the deliberate way he approached Officer Chow from behind and placed both hands on him to force him to the ground.  *Id.*  Officer Chow was engaged in the performance of his official duties at the time of the assault, as demonstrated by the fact that he was actively working to repel other rioters and was wearing a jacket bearing the words "U.S. Capitol Police" in clear, block letters across the back.  *Id.*  And while the fifth and final element of this offense is satisfied by the fact that Kelley made physical contact with Officer Chow while assaulting him, *see id.*, it is separately satisfied by the fact that Kelley committed this assault with the intent to commit the felony of obstructing an officer during a civil disorder, as charged in Count One and analyzed above, *supra* Section II.A.

Having found beyond a reasonable doubt each element of the offense charged in Count One, the Court finds Kelley **GUILTY** of **Count Three**, **Assaulting, Resisting, or Impeding USCP Officer Albert Chow**, in violation of 18 U.S.C. § 111(a)(1).

### D. Count Four: Destruction of Government Property (Senate Wing Door)

To find Kelley guilty of Count Four, Injuring, Damaging, or Destroying Government Property, in violation of 18 U.S.C. § 1361, the Court must find beyond a reasonable doubt that: (1) Kelley injured, damaged, or destroyed property, or attempted to do so; (2) Kelley did so willfully; and (3) the property belonged to the United States. To find Kelley guilty of a felony offense, as charged in Count Four, the Court must also find that the damage or attempted damage at issue exceeded $1,000 in value.

Kelley caused severe damage to the Senate Wing Door, satisfying the first element of this offense. After kicking the door twice from the outside and attempting to force it open from the inside with his hands, Kelley forcibly kicked open the locked door from the inside, evidently damaging the locking mechanism in the process. Gov't Exs. 307B at 2:05–2:08, 104 at 1:23–1:30.

Kelley's actions were willful, satisfying the second element of this offense. A person acts "willfully" when he "act[s] with knowledge that his conduct [is] unlawful." *Bryan v. United States*, 524 U.S. 184, 192 (1998) (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)); *see also United States v. Burden*, 934 F.3d 675, 680 (D.C. Cir. 2019) (concluding that a person acts "willfully" when he is "aware of and knowingly violate[s] [his] legal obligation not to commit the charged *actus reus*"). The record shows that Kelley knew his actions were unlawful for many reasons, including because he was intentionally damaging federal property and because he knew—having encountered and crossed multiple signs and police barriers—that he did not have lawful authority to be at the U.S. Capitol or on its grounds on January 6. *See* Gov't Ex. 403–04; Oct. 28 Tr. at 39–42; *see also* Gov't Ex. 402 (illustrating perimeter).

Finally, the parties have stipulated that the Senate Wing Door was property belonging to the United States and that the cost to repair or replace the door because of the damage it suffered

on January 6, 2021, was approximately $7,260, satisfying the remaining elements of this felony offense. *See* Oct. 28 Tr. at 91–92. Even assuming, without deciding, that Kelley was not solely responsible for the damage the door sustained on January 6, he plainly caused a substantial fraction of that damage when he forcibly kicked the door open. Because Kelley is responsible for at least a substantial portion of the $7,260 cost to repair or replace the door following the events of January 6, the Court finds that he caused damage amounting to more than $1,000 to property of the United States.

Having found beyond a reasonable doubt each element of the offense charged in Count Four, the Court finds Kelley **GUILTY** of **Count Four**, **Injuring, Damaging, or Destroying Government Property**, in violation of 18 U.S.C. § 1361.

### E. Count Five: Destruction of Government Property (Adjacent Window)

To find Kelley guilty of Count Five, Injuring, Damaging, or Destroying Government Property, in violation of 18 U.S.C. § 1361, the Court must find beyond a reasonable doubt that: (1) Kelley injured, damaged, or destroyed property; (2) Kelley did so willfully; and (3) the property belonged to the United States. The parties agree that because Count Five of the Superseding Indictment alleges that that the damage or attempted damage to the property was less than $1,000 in value, the Court must find that the damage or attempted damage at issue for this count was less than $1,000 in value. *See* Joint Proposed Jury Instructions at 18.

Kelley caused damage to the window adjacent to the Senate Wing Door, satisfying the first element of this offense. Gov't Ex. 307B at 1:56–2:01. The parties stipulated that the cost to repair or replace the window because of the damage it suffered on January 6, 2021, was approximately $774. Kelley contributed to that damage, in an amount less than $1,000 in value, by using a long plank of wood to forcibly shatter part of the window. Gov't Ex. 307B at 1:56–2:01.

Kelley acted willfully when damaging the window adjacent to the Senate Wing Door, to the same extent and for the same reasons as he acted willfully when damaging the door itself, which are described above in the analysis of Count Four. *See supra* Section II.D; *Bryan*, 524 U.S. at 192; *Burden*, 934 F.3d at 680.

Finally, the parties have stipulated that the window adjacent to the Senate Wing Door was property belonging to the United States. *See* Oct. 28 Tr. at 91–92. The Court therefore finds that the property Kelley damaged belonged to the United States.

Having found beyond a reasonable doubt each element of the offense charged in Count Five, the Court finds Kelley **GUILTY** of **Count Five**, **Injuring, Damaging, or Destroying Government Property**, in violation of 18 U.S.C. § 1361.

### F. Count Six: Entering and Remaining in a Restricted Building or Grounds

To find Kelley guilty of Count Six, Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1), the Court must find beyond a reasonable doubt that: (1) Kelley entered or remained in a restricted building or grounds without lawful authority to do so; and (2) Kelley did so knowingly.

The term "restricted building or grounds" means any posted, cordoned off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service—such as the Vice President or an immediate family member of the Vice President—is or will be temporarily visiting. *See* 18 U.S.C. §§ 1752(c), 3056(a)(1)–(2).

To prove that Kelley acted "knowingly" for purposes of this offense, the Government must prove that he knew that he was in a "posted, cordoned off, or otherwise restricted area," but the Government does not need to prove that Kelley knew the area was "a building or grounds where a

person protected by the Secret Service is or will be temporarily visiting."[2]  *See United States v. Griffin*, No. 22-3042, 2024 WL 4536993, at \*2, \*19 (D.C. Cir. Oct. 22, 2024).

Kelley knowingly entered and remained in a restricted building without lawful authority to do so.  On January 6, 2021, the entirety of the U.S. Capitol and its grounds were posted, cordoned off, and otherwise restricted in part because Vice President Pence was scheduled to be present at a joint session of Congress to preside over the certification of the vote of the Electoral College. Oct. 28 Tr. at 67–71.  Multiple barriers and signs posted around the perimeter of the Capitol grounds made clear that the area was restricted and not open to members of the public.  *See* Oct. 28 Tr. at 39, 113–15; Gov't's Ex. 409; *see also* Gov't's Ex. 310 at 4:46–5:03.  Nonetheless, Kelley entered the U.S. Capitol Building through a broken window and remained inside the building for approximately 42 minutes, without lawful authority to do so and without submitting to the security screening that is required of all members of the public who visit the Capitol.  *See* Gov't's Ex. 104A at 1:10–1:13; Gov't's Ex. 124B at 0:53–58.

Kelley knew that the entirety of the U.S. Capitol and its grounds were a "posted, cordoned off, or otherwise restricted" area on January 6.  Kelley knew of this restriction because he crossed several prominent barriers and signs on his path from Peace Circle to the West Front of the Capitol Building.  *See* Gov't's Ex. 416; Oct. 29 Tr. at 68–69.  Kelley also knew that the Capitol Building itself was restricted because he personally encountered multiple USCP officers who attempted to stop his approach and entry into the building.  *See, e.g.*, Gov't's Ex. 206A at 0:01; Gov't's Ex.

---

[2] Nonetheless, the Court finds beyond a reasonable doubt that Kelley knew that Vice President Pence was or would be present at the Capitol at the time he entered.  The Court infers this knowledge from Kelley's attendance at President Trump's "Stop the Steal" rally, at which President Trump repeatedly referenced Vice President Pence's role in the certification proceeding taking place at the Capitol.  *See* Gov't's Ex. 615 at 6, 10, 20, 25; *see also* Gov't's Ex. 508 (photo taken at President Trump's rally, recovered from Kelley's cell phone).

302A at 2:12–2:47.  Therefore, Kelley acted "knowingly" when he unlawfully entered and remained in a restricted building or grounds, as charged in Count Six.

The Court finds beyond a reasonable doubt that each element of the offense charged in Count Six is satisfied, and it therefore finds Kelley **GUILTY** of **Count Six**, **Entering and Remaining in a Restricted Building or Grounds**, in violation of 18 U.S.C. § 1752(a)(1).

### G. Count Seven: Disorderly and Disruptive Conduct in a Restricted Building or Grounds

To find Kelley guilty of Count Seven, Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2), the Court must find beyond a reasonable doubt that: (1) Kelley engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building or grounds; (2) Kelley did so knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions; and (3) Kelley's conduct occurred when, or so that, his conduct in fact impeded or disrupted the orderly conduct of Government business or official functions.

As described above in the analysis of Count Six, the U.S. Capitol Building and its grounds were a "restricted building or grounds" on January 6, 2021, and Kelley knew that these areas were "posted, cordoned off, or otherwise restricted."  *See supra* Section II.F.

Kelley knowingly engaged in "disorderly" and "disruptive" conduct in the Capitol Building on January 6.  "[C]onduct is disorderly if, viewed in the circumstances in which it takes place, it is likely to endanger public safety or create a public disturbance."  *United States v. Alford*, 89 F.4th 943, 950 (D.C. Cir. 2024), *cert. denied*, No. 23-7158, 2024 WL 4426724 (U.S. Oct. 7, 2024).  Similarly, conduct is "disruptive" if, "taken in context," it tends "to interfere with or inhibit usual proceedings."  *Id.* at 951.  Kelley took several actions in the Capitol Building that were both disorderly and disruptive, including forcing open the Senate Wing Door to allow other rioters to

enter without lawful authority and marching with a crowd of rioters through areas of the building that members of the public were not lawfully permitted to enter. *See* Gov't's Ex. 307B at 2:05–2:08; Govt's Ex. 104 at 1:23–1:30; Gov't's Ex. 309 at 0:13–0:53. Because Kelley's actions "contributed to the Congress's multi-hour delay in completing the electoral certification" and "jeopardized the safety of the Congress as well as the police on the scene," those actions were both "disruptive" and "disorderly" within the meaning of the statute he is charged with violating in Count Seven. *See Alford*, 89 F.4th at 952–53.

Kelley engaged in this conduct with the intent to impede or disrupt the orderly conduct of the joint session of Congress to count the votes of the Electoral College. Kelley's intent to impede this proceeding is evident from his gestures toward USCP Officer Eugene Goodman, which he made while other rioters in the crowd were demanding to know where Members of Congress were counting the votes. *See* Gov't's Ex. 309 at 0:47–0:53, 1:04; Oct. 28 Tr. at 188–89. Kelley heard other rioters demand this information and pointed in Officer Goodman's direction, indicating that he wanted to know where the proceeding was taking place so that he and other rioters could go there to disrupt it. *See* Gov't's Ex. 309 at 1:04. Kelley's intent to disrupt the joint session of Congress is also evident from the fact that, once past Officer Goodman, Kelley moved from room to room until he eventually reached the Senate Gallery, where he discovered that Members of Congress had recessed from the chamber and were no longer meeting there in connection with the proceeding to certify the votes of the Electoral College. *See* Gov't's Exs. 121A, 108A, 104B, 115, 118A, 199A, 116A, 110, 111A, 505; Oct. 29 Tr. at 81–95.

Finally, Kelley's actions and his presence in the Capitol Building, like that of every other rioter present on January 6, in fact impeded or disrupted the orderly conduct of official federal functions, including the certification of the votes of the Electoral College. *See* Oct. 28 Tr. at 60.

The Court finds beyond a reasonable doubt that each element of the offense charged in Count Seven is satisfied, and it therefore finds Kelley **GUILTY** of **Count Seven**, **Disorderly and Disruptive Conduct in a Restricted Building or Grounds**, in violation of 18 U.S.C. § 1752(a)(2).

### H.  Count Eight: Engaging in Physical Violence in a Restricted Building or Grounds

To find Kelley guilty of Count Eight, Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4), the Court must find beyond a reasonable doubt that: (1) Kelley engaged in an act of physical violence against any person or property in any restricted building or grounds; (2) Kelley did so knowingly.

As described above in the analysis of Count Six, the U.S. Capitol Building and its grounds were a "restricted building or grounds" on January 6, 2021, and Kelley knew that these areas were "posted, cordoned off, or otherwise restricted." *See supra* Section II.F.

Kelley knowingly engaged in an act of physical violence against a person in restricted grounds when he assaulted Officer Chow under the scaffolding on the West Front of the Capitol Building, as described above in the analysis of Count Three. *See supra* Section II.C.  Kelley also knowingly engaged in an act of physical violence against property in a restricted building when he kicked open the Senate Wing Door from the inside, as described above in the analysis of Count Four. *See supra* Section II.D.

The Court finds beyond a reasonable doubt that each element of the offense charged in Count Eight is satisfied, and it therefore finds Kelley **GUILTY** of **Count Eight**, **Engaging in Physical Violence in a Restricted Building or Grounds**, in violation of 18 U.S.C. § 1752(a)(4).

### I.  Count Nine: Entering and Remaining in the Gallery of a House of Congress

To find Kelley guilty of Count Nine, Entering and Remaining in the Gallery of a House of Congress, in violation of 40 U.S.C. § 5104(e)(2)(B), the Court must find beyond a reasonable

doubt that: (1) Kelley entered or remained in the gallery of a House of Congress without authorization and in violation of the rules governing admission, and (2) Kelley acted willfully and knowingly.  The term "gallery of a House of Congress" includes the Senate Gallery.

Kelley entered the Senate Gallery without authorization at a time when it was closed to all members of the public.  *See* Gov't's Exs. 505–06, 111A at 1:19, 112 at 1:19; Oct. 28 Tr. at 52–54. Kelley also did not undergo any security screening before entering the Senate Gallery, violating rules that require members of the public to pass through two levels of security screening before entering the gallery.  *See* Oct. 28 Tr. at 56–57, 104–05.

Kelley acted "willfully" and "knowingly" when he entered the Senate Gallery for the same reasons described above in the analysis of Count Four:  He knew what he was doing and that his entry into the gallery, like his presence in the Capitol Building during the riot on January 6, was unlawful.  *See supra* Section II.D; *Bryan*, 524 U.S. at 192; *Burden*, 934 F.3d at 680.

The Court finds beyond a reasonable doubt each element of the offense charged in Count Nine is satisfied, and it therefore finds Kelley **GUILTY** of **Count Nine**, **Entering and Remaining in the Gallery of a House of Congress**, in violation of 40 U.S.C. § 5104(e)(2)(B).

### J.   Count Ten: Disorderly Conduct in a Capitol Building

To find Kelley guilty of Count Ten, Disorderly or Disruptive Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D), the Court must find beyond a reasonable doubt that: (1) Kelley engaged in disorderly or disruptive conduct in any of the United States Capitol Buildings or Grounds, (2) Kelley did so with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, and (3) Kelley acted willfully and knowingly.  The "United States Capitol Buildings" include the United States Capitol.

As described above in the analysis of Count Seven, Disorderly and Disruptive Conduct in a Restricted Building or Grounds, Kelley knowingly engaged in "disorderly" and "disruptive"

conduct in the Capitol Building on January 6 with the intent to impede the orderly conduct of the joint session of Congress to certify the votes of the Electoral College.  *See supra* Section II.G.

Kelley acted "willfully" and "knowingly" when engaging in this disorderly and disruptive conduct for the same reasons described above in the analysis of Count Four:  He knew what he was doing and that his disorderly and disruptive conduct and presence in the Capitol Building during the riot on January 6 were unlawful.  *See supra* Section II.D; *Bryan*, 524 U.S. at 192; *Burden*, 934 F.3d at 680.

The Court finds beyond a reasonable doubt that each element of the offense charged in Count Ten is satisfied, and it therefore finds Kelley **GUILTY** of **Count Ten**, **Disorderly or Disruptive Conduct in a Capitol Building or Grounds**, in violation of 40 U.S.C. § 5104(e)(2)(D).

### K.  Count Eleven: Act of Physical Violence in the Capitol Grounds or Buildings

To find Kelley guilty of Count Eleven, an Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F), the Court must find beyond a reasonable doubt that: (1) Kelley engaged in an act of physical violence in any of the United States Capitol Buildings or Grounds; and (2) Kelley acted willfully and knowingly.

As described above in the analysis of Count Eight, Engaging in Physical Violence in a Restricted Building or Grounds, Kelley committed an act of physical violence against a person in the Capitol Grounds when he assaulted Officer Chow, and he committed an act of physical violence against property in the Capitol Building when he kicked open the Senate Wing Door from inside.  *See supra* Section II.H.

Kelley acted "willfully" and "knowingly" when engaging in this violent conduct for the same reasons described above in the analysis of Count Four:  He knew what he was doing and that

his violent actions and presence in the Capitol Building and its grounds during the riot on January 6 were unlawful.  *See supra* Section II.D; *Bryan*, 524 U.S. at 192; *Burden*, 934 F.3d at 680.

The Court finds beyond a reasonable doubt that each element of the offense charged in Count Eleven is satisfied, and it therefore finds Kelley **GUILTY** of **Count Eleven**, **an Act of Physical Violence in the Capitol Grounds or Buildings**, in violation of 40 U.S.C. § 5104(e)(2)(F).

### L. Count Twelve: Parading, Demonstrating, or Picketing in a Capitol Building

To find Kelley guilty of Count Twelve, parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), the Court must find beyond a reasonable doubt that: (1) Kelley paraded, demonstrated, or picketed in any of the United States Capitol Buildings, and (2) Kelley acted willfully and knowingly.

Kelley demonstrated in a Capitol Building on January 6 by marching through the Senate Wing with a crowd of rioters who were shouting political slogans and demands, and at least one of whom was carrying a flag bearing the name of President Trump.  *See* Gov't's Ex. 309 at 0:13–1:04.  People are "demonstrat[ing]" within the meaning of the statute at issue in Count Twelve whenever they are "gathering or individually drawing attention to themselves inside the Capitol buildings to express support for or disapproval of an identified action or viewpoint."  *United States v. Nassif*, 97 F.4th 968, 980 (D.C. Cir. 2024).  "Under any plausible definition of the term," a person is "demonstrating" when he "join[s] a group of hundreds of people, many carrying signs, banners, or flags, who shout[] or chant[] as they descend[] on and enter[] into the Capitol seeking to halt the certification of the 2020 election."  *Id.* at 981.  Kelley's march through the Capitol Building with the crowd of rioters that entered through the Senate Wing Door plainly satisfies this definition.  *See* Gov't's Ex. 309 at 0:13–1:04.

Kelley acted "willfully" and "knowingly" when engaging in this conduct for the same reasons described above in the analysis of Count Four:  He knew what he was doing and that his participation in a demonstration in the Capitol Building during the riot on January 6 was unlawful. *See supra* Section II.D; *Bryan*, 524 U.S. at 192; *Burden*, 934 F.3d at 680.

The Court finds beyond a reasonable doubt that each element of the offense charged in Count Twelve is satisfied, and it therefore finds Kelley **GUILTY** of **Count Twelve**, **Parading, Demonstrating, or Picketing in a Capitol Building**, in violation of 40 U.S.C. § 5104(e)(2)(G).

### III. CONCLUSION

For the foregoing reasons, the Court finds the Defendant, Edward Kelley:

- **GUILTY** of **Count One**, **Obstructing Officers During a Civil Disorder**, in violation of 18 U.S.C. § 231(a)(3);

- **NOT GUILTY** of **Count Two**, **Obstruction of an Official Proceeding and Aiding and Abetting the Same**, in violation of 18 U.S.C. §§ 1512(c) and 2;

- **GUILTY** of **Count Three**, **Assaulting, Resisting, or Impeding Certain Officers**, in violation of 18 U.S.C. § 111(a)(1);

- **GUILTY** of **Count Four**, **Destruction of Government Property Causing Damage in an Amount Exceeding $1,000**, in violation of 18 U.S.C. § 1361;

- **GUILTY** of **Count Five**, **Destruction of Government Property Causing Damage in an Amount Less Than $1,000**, in violation of 18 U.S.C. § 1361;

- **GUILTY** of **Count Six**, **Entering and Remaining in a Restricted Building or Grounds**, in violation of 18 U.S.C. § 1752(a)(1);

- **GUILTY** of **Count Seven**, **Disorderly and Disruptive Conduct in a Restricted Building or Grounds**, in violation of 18 U.S.C. § 1752(a)(2);

- **GUILTY** of **Count Eight**, **Engaging in Physical Violence in a Restricted Building or Grounds**, in violation of 18 U.S.C. § 1752(a)(4);

- **GUILTY** of **Count Nine**, **Entering and Remaining in the Gallery of a House of Congress**, in violation of 40 U.S.C. § 5104(e)(2)(B);

- **GUILTY** of **Count Ten**, **Disorderly Conduct in a Capitol Building**, in violation of 40 U.S.C. § 5104(e)(2)(D);

- **GUILTY** of **Count Eleven, Act of Physical Violence in the Capitol Grounds or Buildings**, in violation of 40 U.S.C. § 5104(e)(2)(F); and

- **GUILTY** of **Count Twelve, Parading, Demonstrating, or Picketing in a Capitol Building**, in violation of 40 U.S.C. § 5104(e)(2)(G).

**Dated:** November 7, 2024

COLLEEN KOLLAR-KOTELLY
United States District Judge

40